Laurence M. Rosen, Esq. (SBN 219683)
THE ROSEN LAW FIRM, P.A.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KAI CHIU, derivatively on behalf of HALYARD HEALTH, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>ROBERT E. ABERNATHY, STEVEN E. VOSKUIL, GARY D. BLACKFORD, JOHN P. BYRNES, RONALD W. DOLLENS, HEIDI K. FIELDS, WILLIAM A. HAWKINS, PATRICK J. O'LEARY, MARIA SAINZ and JULIE SHIMER,<br><br>Defendants,<br><br>and<br><br>HALYARD HEALTH, INC.,<br><br>Nominal Defendant. | Case No.<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Kai Chiu ("Plaintiff"), by his undersigned attorneys, derivatively on behalf of Nominal Defendant Halyard Health, Inc. ("Halyard" or the "Company"), files this Shareholder Derivative Complaint against Defendants Robert E. Abernathy, Steven E. Voskuil, Gary D. Blackford, John P. Byrnes, Ronald W. Dollens, Heidi K. Fields, William A. Hawkins, Patrick J. O'Leary, Maria Sainz and Julie Shimer (collectively, the "Individual Defendants") for breaches of their fiduciary duties as directors and/or officers of Halyard, unjust enrichment, waste of corporate assets, abuse of control, gross mismanagement, violations of Section 14(A) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for his complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Halyard, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by Halyard's directors and officers who breached their fiduciary duties starting in 2014 and continuing through the present (the "Relevant Period").

**Halyard History**

2. Halyard provides health and healthcare supplies and solutions worldwide with an emphasis on the treatment and prevention of infectious diseases and pain and the facilitation of recovery. These supplies include personal protective equipment like eye shields, face masks and disposable gowns. Halyard operates through two business platforms -- surgical and infection prevention and medical devices. Halyard markets its products directly to hospitals and other healthcare providers, as well as through third-party distribution channels.

3. Halyard sells its recognized brands and products in more than 100 countries, and holds leading market positions in multiple categories across the health care industry.

4. Prior to November 2014, Halyard was the health care operating segment of Kimberly-Clark Corporation ("Kimberly-Clark") known as Kimberly-Clark Health Care, Inc. ("KCH"). Kimberly-Clark is a manufacturer of personal care, consumer

tissue, and professional products. Kimberly-Clark's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "KMB."

5. Halyard became its own independent company headquartered in Alpharetta, Georgia on October 31, 2014 through a spin-off. Halyard stock began trading on the NYSE under the ticker symbol "HYH" on or about October 21, 2014.

6. Under the terms of the distribution agreement Halyard entered into with Kimberly-Clark prior to the spin-off, legal proceedings, claims and other liabilities that are primarily related to Halyard's business are Halyard's own responsibility and Halyard is obligated to indemnify and hold Kimberly-Clark harmless for such matters ("Indemnification Obligation").

7. Halyard operates 11 global manufacturing facilities with 12,000 employees worldwide – generating approximately $1.7 billion in net revenues.

**MICROCOOL Surgical Gown**

8. In 2014, Halyard became the primary supplier for certain protective medical equipment and supplies needed for prevention of the Ebola virus in Guinea, Liberia, Sierra Leone, and other West African nations. One such item in high demand during the Ebola outbreak was the Company's MICROCOOL surgical gown.

9. The Company marketed the MICROCOOL surgical gown as a breathable impervious gown providing the highest level of protection from air borne diseases and other pathogens during any procedure, and is designed especially for

those that are longer and more fluid-intensive. The MICROCOOL gown was supposed to help prevent blood and other body fluids from penetrating through to the skin and protect from the risk of infection through a protective film layer.

10. As reported cases of the Ebola virus continued to grow, so did orders for the Company's MICROCOOL gowns.

11. However, the popularity of the MICROCOOL gowns was short-lived as the Company became the target of various lawsuits alleging Halyard falsely claimed its gowns protected against Ebola and other infectious diseases, and that the Company knew for at least a year that its MICROCOOL Gown had failed industry tests of impermeability to blood and microbes, but it continued to claim the product provided the highest level of protection against diseases including Ebola.

**<u>The Two Qui Tam Actions</u>**

12. One of two qui tam actions was filed in this Court on October 27, 2014, a few days after the spin-off of Halyard, and is captioned *U.S. ex rel. Shahinian, et al. v. Kimberly-Clark Corporation,* No. 2:14-cv-08313-JAK-JPR (C.D. Cal.) (the "First Qui Tam Action"). A second qui tam action, captioned *U.S. ex rel. Edgett, et al. v. Kimberly-Clark Corporation, Halyard Health, Inc., et al,* No. 3:15-cv-00434-B (N.D. Tex.) (the "Second Qui Tam Action"), was filed on February 9, 2015. Both qui tam actions allege, among other things, violations of the Federal False Claims Acts, 31

U.S.C. § 3729 *et seq.*, and parallel state law false claims provisions in connection with Halyard's marketing and sale of certain surgical gowns.

**The Consumer Class Action**

13. A consumer class action, captioned *Prime Healthcare Centinela, LLC, et al. v. Kimberly-Clark Corporation, et al.*, (f/k/a *Shahinian, et al. v. Kimberly-Clark Corporation, et al.*) No. 2:14-cv-08390-DMG-SH (C.D. Cal.) (the "Consumer Class Action"), was filed on October 29, 2014, also in this Court, on behalf of a putative nationwide class asserting various tort and statutory claims against Kimberly-Clark and Halyard arising out of Halyard's marketing and sale of MICROCOOL surgical gowns.

**VA OIG Subpoena**

14. The foregoing actions led to a June 2015 subpoena from the U.S. Department of Veterans Affairs, Office of the Inspector General ("VA OIG") seeking information related to the design, manufacture, testing, sale and promotion of MICROCOOL and other Company surgical gowns.

15. One month later, Halyard also became aware that the subpoena and an earlier VA OIG subpoena served on Kimberly-Clark requesting information about gown sales to the federal government, were both related to a United States Department of Justice ("DOJ") investigation.

***60 Minutes* Report**

16. On May 1, 2016, the downward spiral continued after a *60 Minutes* expose aired in which an inside source at Halyard confided that Halyard's MICROCOOL surgical gowns were susceptible to infiltration, and that they failed to satisfy industry safety standards for the treatment of Ebola. This was especially damaging given the popularity and credibility attributed to the investigatory CBS Television Network show *60 Minutes*.[1]

17. Adding to this reputational harm, the Wall Street Journal ran an article a day later on May 2, 2016 titled: "Halyard Denies '60 Minutes' Allegations it Sold Defective Ebola Protection Kimberly-Clark spinoff says its Microcool gowns haven't led to any health worker infections."

18. In the article, the Wall Street Journal reported:

> Halyard Health Inc. on Monday denied allegations in a "60 Minutes" report that the medical products and devices maker deliberately sold defective protective equipment to health-care workers following the recent Ebola outbreak. The company's stock slipped 0.9% to $27.90 in premarket trading. On Friday, shares fell 11% to $28.16 after a preview of the "60 Minutes" report was published online. Halyard Health, which was spun off from Kimberly-Clark Corp. in 2014, reiterated Monday that its Microcool gowns have received

[1] 60 Minutes, the most successful television broadcast in history, is in its 49th season on the CBS Television Network. Offering hard-hitting investigative reports, interviews, feature segments and profiles of people in the news, the broadcast begun in 1968 is still a hit in 2016. The average audience for a 60 Minutes broadcast is 150 percent higher than those of the network morning news programs, a figure that still dwarfs the biggest audiences on cable news. *See* http://www.cbsnews.com/60-minutes/about-us/

> fewer than one complaint for every million gowns sold and that it hasn't heard of a health-care professional being infected as a result of a flaw in its product.

19. Also on May 2, 2016, Halyard stock fell $1.21 per share, or 4.3%, to close at $26.95 per share.

**DOJ Subpoena and Investigation**

20. In May 2016, the Company was served with a subpoena from the DOJ seeking further information related to Company gowns.

21. The DOJ investigations began in 2015 or earlier.

**The Securities Class Action**

22. A fourth action, captioned *Ronald Jackson, Individually and on Behalf of all Others Similarly Situated v. Halyard Health, Inc., et al.*, No. 1:16-cv-05093 (S.D.N.Y.), was filed on June 28, 2016 on behalf of a class asserting violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 and violations of Section 20(a) of the Exchange Act (the "Securities Class Action").

23. Throughout the Relevant Period, the investing public was under a false impression of the Company's financial success and the efficacy of the MICROCOOL surgical gown.

24. During the Relevant Period, the Individual Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, the Individual Defendants made false and/or

misleading statements and/or failed to disclose that (i) the Company's MICROCOOL surgical gowns consistently failed effectiveness tests and failed to meet industry standards; (ii) complaints were frequently received and major litigation proceedings and federal investigations were commenced concerning the quality, marketing and sale of the Company's MICROCOOL surgical gowns; and (iii) Kimberly-Clark and Halyard had knowingly marketed, sold, and distributed defective MICROCOOL surgical gowns, including to U.S. workers during the Ebola crisis.

25. To the detriment of the Company, the Individual Defendants caused Halyard to conceal from consumers, the general public and the government that the MICROCOOL gowns failed industry test and were at risk for allowing bodily fluid, bacteria, and other harmful matters to pass between patients and health care professionals. The Individual Defendants also caused Halyard to continue the sale and distributions of the defective MICROCOOL surgical gowns afterward, which has inflicted enormous damages upon the Company's reputation, goodwill and industry standing and have exposed the Company to substantial liabilities for violations of federal and state laws.

26. The Individual Defendants' breaches of fiduciary duty and other misconduct have incurred substantial damages to the Company, which include (but are not limited to) damages arising from the two Qui Tam Actions, Consumer Class Action, the Securities Class Action, the VA OIG subpoena, the DOJ investigation,

and the need to undertake internal investigations. Other losses caused to the Company by the Individual Defendants include, but not limited to, losses from the waste of corporate assets, losses suffered because of the reputational injury and losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company. The Company has already incurred millions of dollars in connection with these matters and will continue to incur significant losses going forward.

27. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of certain of them in the Securities Class Action and of their not being disinterested and/or independent directors, a majority of the Board of Directors ("Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

28. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R.

§ 240.14a-9, and raise a federal question pertaining to the Federal False Claims Act, 31 U.S.C. §§ 3729-3733, the VA OIG subpoena, and the DOJ investigation.

29. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

30. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

31. Venue is proper in this district because a portion of the transactions and wrongs complained of herein, including the Defendants' participation in the wrongful acts detailed herein, have occurred in this district. In addition, the Defendants have conducted substantial business in this district, and have derived substantial compensation from their activities in this district.

## PARTIES

**Plaintiff**

32. Plaintiff is a current shareholder of Halyard common stock. Plaintiff has continuously held Halyard common stock at all relevant times.

**Nominal Defendant Halyard**

33. Nominal Defendant Halyard is a Delaware corporation with its principal executive offices located at 5405 Windward Parkway, Alpharetta, Georgia 30004.

34. Halyard stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "HYH."

**Defendant Abernathy**

35. Defendant Robert Abernathy ("Abernathy") has been the Company's CEO since October 31, 2014. Defendant Abernathy also serves as Chairman of the Board. According to the Company's Schedule 14A on Form DEF 14A filed with the SEC on March 11, 2016 (the "2016 Proxy"), as of March 4, 2016, Defendant Abernathy beneficially owned 191,827 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 4, 2016 was $27.83, Abernathy beneficially owned $5,338,545.41 worth of Halyard stock.

36. For the fiscal year ended December 31, 2015, Defendant Abernathy received $5,595,758 in compensation from the Company. This included $837,375 in salary and $4,758,383 in stock and other compensation.

37. The Company's 2016 Proxy stated the following about Defendant Abernathy:

> Robert E. Abernathy, age 61, has been the Chairman of our Board of Directors and our Chief Executive Officer since our spin-off from Kimberly-Clark on October 31, 2014. He served as President Global Health Care of Kimberly-Clark from June 2014 until our spin-off from Kimberly-Clark on October 31, 2014. Prior to that he served as an Executive Vice President of Kimberly-Clark from November 2013 to June 2014 and prior to that served as Kimberly-Clark's Group President — Europe, Global Nonwovens, and Continuous Improvement & Sustainability from 2012 to November 2013. He had overall responsibility for Kimberly-Clark's Health Care business from 1997 to early 2004. His past responsibilities at Kimberly-Clark have also included overseeing its businesses in Asia, Latin America, Eastern Europe, the Middle

> East and Africa, as well as operations and major project management in North America. He was appointed Vice President — North American Diaper Operations in 1992; Managing Director of Kimberly-Clark Australia Pty. Limited in 1994; Group President — Developing and Emerging Markets in 2004; and Group President — North Atlantic Consumer Products in 2008. Mr. Abernathy also serves as a director of RS Legacy Corporation (formerly RadioShack Corporation). Mr. Abernathy was selected to serve as the Chairman of our Board of Directors due to his leadership experience as our Chief Executive Officer and as an executive vice president of Kimberly-Clark, knowledge of, and experience in, the healthcare industry, international experience and governance and public company board experience.

**<u>Defendant Blackford</u>**

38. Defendant Gary D. Blackford ("Blackford") has served as a director of the Company since October 2014. Defendant Blackford serves as the Chair of the Governance Committee and a member of the Audit Committee. According to the 2016 Proxy, as of March 4, 2016, Defendant Blackford beneficially owned 8,225 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 4, 2016 was $27.83, Blackford owned $228,901.75 worth of Halyard stock.

39. For the fiscal year ended December 31, 2015, Defendant Blackford received $210,000 in compensation from the Company. This included $70,000 in cash and $140,000 in stock.

40. The 2016 Proxy stated the following about Defendant Blackford:

> Gary D. Blackford, age 58, was elected to our Board in October 2014. Mr. Blackford is the Chairman of our Governance Committee. From 2002 until

February 2015, Mr. Blackford was the Chairman of the Board and Chief Executive Officer of Universal Hospital Services, Inc. ("UHS"), a leading, nationwide provider of medical technology outsourcing and services to the health care industry. Mr. Blackford was the Chief Executive Officer of Curative Health Services, Inc., a specialty pharmacy and health services company, from 2001 to 2002. He was also the Chief Executive Officer of ShopforSchool, Inc., an online retailer, from 1999 to 2001. Mr. Blackford also serves as a director of Wright Medical Group, N.V., a global medical device company. Mr. Blackford has been selected to serve as a member of our Board of Directors due to his executive leadership experience as a chief executive officer, financial literacy and experience in finance and accounting, international experience, and governance and public company board experience.

**Defendant Voskuil**

41. Defendant Steven E. Voskuil ("Voskuil") has served as Halyard's Chief Financial Officer ("CFO") since October 31, 2014. As of April 1, 2016, Defendant Voskuil received $436,450 in salary from the Company. According to the 2016 Proxy, as of March 4, 2016, Defendant Voskuil beneficially owned 111,829 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 4, 2016 was $27.83, Voskuil beneficially owned about $3,112,201.07 worth of Halyard stock.

**Defendant Byrnes**

42. Defendant John P. Byrnes ("Byrnes") has been a Company director since October 2014. He is a member of the Compensation and Compliance Committee. According to the 2016 Proxy, as of March 3, 2016, Defendant Byrnes beneficially owned 8,253 shares of the Company's common stock. Given that the price per share

of the Company's common stock at the close of trading on March 4, 2016 was $27.83, Byrnes beneficially owned about $229,680.99 worth of Halyard stock.

43. For the fiscal year ended December 31, 2015, Defendant Byrnes received $210,000 in compensation from the Company. This included $70,000 in cash and $140,000 in stock.

44. The 2016 Proxy stated the following about Defendant Byrnes:

> John P. Byrnes, age 57, was elected to our Board in October 2014. Mr. Byrnes served as the Chairman of the Board of Lincare Holdings, Inc. ("Lincare"), a provider of home respiratory care, infusion therapy and medical equipment, from March 2000 through August 2012 and as a director of Lincare from May 1997 to March 2015. Mr. Byrnes was the Chief Executive Officer of Lincare from 1997 until March 2015 and served as Lincare's President from June 1996 until April 2003. Prior to becoming Lincare's President, Mr. Byrnes served in a number of capacities at Lincare over a ten-year period, including serving as Chief Operating Officer throughout 1996. Mr. Byrnes was a director of Kinetic Concepts, Inc., a publicly-traded global medical technology company devoted to the discovery, development, manufacturing and marketing of innovative, high- technology therapies and products, from January 2003 until February 2011 and of U.S. Renal Care, Inc., a dialysis provider, from August 2005 until 2012. Mr. Byrnes has been selected to serve as a member of our Board of Directors due to his leadership experience as a chief executive officer, knowledge of, and experience in, the healthcare industry, international experience and governance and public company board experience.

**<u>Defendant Dollens</u>**

45. Defendant Ronald W. Dollens ("Dollens") has served as a director of the Company since October 2014, and currently serves as the Lead Director of the Board. According to the 2016 Proxy, as of March 4, 2016, Defendant Dollens beneficially owned 8,225 shares of the Company's common stock. Given that the price per share

of the Company's common stock at the close of trading on March 4, 2016 was $27.83, Dollens beneficially owned about $228,901.75 worth of Halyard stock.

46. For the fiscal year ended December 31, 2015, Defendant Dollens received $230,000 in compensation from the Company. This included $90,000 in cash and $140,000 in stock.

47. The 2016 Proxy stated the following about Defendant Dollens:

> Ronald W. Dollens, age 69, was elected to our Board in October 2014. Mr. Dollens is the Lead Director of our Board of Directors, and, as such, serves as the Chairman of the Executive Committee. Mr. Dollens retired as the President and Chief Executive Officer of Guidant Corporation, a global producer of cardiovascular therapeutic devices and related products, in 2005 where he had served since its spin-off from Eli Lilly & Company in 1994. Prior to that time, he held various management positions at Eli Lilly & Company from 1972 until 1994. From 2000 until 2011, he served on the Board of Directors of Kinetic Concepts, Inc., a publicly-traded global medical technology company devoted to the discovery, development, manufacturing and marketing of innovative, high-technology therapies and products, and served as Chairman from 2005 until 2011. Mr. Dollens has also served on the Board of Directors of Abiomed, Inc. from 2006 until October 2010, and Beckman Coulter, Inc. from 1999 until April 2005. Mr. Dollens has been selected to serve as the Lead Director of our Board of Directors due to his leadership experience as a chief executive officer, knowledge of, and experience in, the healthcare industry, international experience and governance and public company board experience.

**Defendant Fields**

48. Defendant Heidi K. Fields ("Fields") has served as a director of the Company since October 2014. Defendant Fields serves as Chair of the Audit Committee and a member of the Governance Committee. According to the 2016

Proxy, as of March 4, 2016, Defendant Fields beneficially owned 8,230 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 4, 2016 was $27.83, Fields beneficially owned about $229,040.9 worth of Halyard stock.

49. For the fiscal year ended December 31, 2015, Defendant Dollens received $225,000 in compensation from the Company. This included $85,000 in cash and $140,000 in stock.

50. The 2016 Proxy stated the following about Defendant Fields:

> Heidi K. Fields, age 61, was elected to our Board in October 2014. Ms. Fields is the Chairperson of the Audit Committee. Ms. Fields retired as the Executive Vice President and Chief Financial Officer of Blue Shield of California, a not-for-profit health plan provider, where she had served since 2003. Prior to that time, she served as the Executive Vice President and Chief Financial Officer of Gap, Inc., a multinational clothing and accessories retailer, from 1999 until 2003. Ms. Fields also serves as a director of Agilent Technologies, Inc., a public research development and manufacturing company, and as a director of Financial Engines, Inc., an investment advisement company. Ms. Fields has been selected to serve as a member of our Board of Directors due to her executive leadership experience as a chief financial officer, financial literacy and experience in finance and accounting, knowledge of, and experience in, the healthcare industry, international experience and governance and public company board experience.

1.

**Defendant Hawkins**

51. Defendant William A. Hawkins ("Hawkins") has served as a director of the Company since December 2015. Defendant Hawkins serves as Chair of the Compliance Committee and a member of the Compensation Committee. According

to the 2016 Proxy, as of March 4, 2016, Defendant Hawkins beneficially owned 10,572 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 4, 2016 was $27.83, Hawkins beneficially owned over $294,218.76 worth of Halyard stock.

52. For the fiscal year ended December 31, 2015, Defendant Hawkins received $17,500 in compensation from the Company. This included $5,833 in cash and $11,667 in stock.

53. The 2016 Proxy stated the following about Defendant Hawkins:

> William A. Hawkins, age 62, was elected to our Board of Directors in December 2015. Mr. Hawkins is the Chairman of our Compliance Committee. Mr. Hawkins serves as the Lead Director at Immucor, Inc., a leading provider of transfusion and transplantation diagnostic products worldwide. He also served as President and Chief Executive Officer of Immucor from October 2011 to July 2015. From 2008 to 2011, he served as Chairman and Chief Executive Officer of Medtronic, Inc., a global leader in medical technology. He served as President and Chief Executive Officer of Medtronic, Inc. from 2007 to 2008, President and Chief Operating Officer of Medtronic, Inc. from 2004 to 2007, and Senior Vice President and President, Vascular of Medtronic, Inc. from 2001 to 2004. From 1998 to 2001 Mr. Hawkins served as President and Chief Executive Officer of Novoste Corporation, a medical equipment company. Prior thereto, Mr. Hawkins served in a variety of senior roles at American Home Products, a consumer products company, Johnson & Johnson, a healthcare company, Guidant Corporation, a medical products company, and Eli Lilly and Company, a global pharmaceutical company. Mr. Hawkins also serves as a director of Thoratec Corporation, a medical device company. Mr. Hawkins was selected to serve as a member of our Board of Directors due to his leadership experience as a chief executive officer, knowledge of, and experience in, the healthcare industry, international experience and governance and public company board experience.

**Defendant O'Leary**

54. Defendant Patrick J. O'Leary ("O'Leary") has served as a director of the company since October 2014. Defendant O'Leary serves as a member of the Audit Committee and Governance Committee. According to the 2016 Proxy, as of March 4, 2016, Defendant O'Leary beneficially owned 8,275 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 4, 2016 was $27.83, O'Leary beneficially owned about $230,293.25 worth of Halyard stock.

55. For the fiscal year ended December 31, 2015, Defendant O'Leary received $210,000 in compensation from the Company. This included $70,000 in cash and $140,000 in stock.

56. The 2016 Proxy stated the following about Defendant O'Leary:

> Patrick J. O'Leary, age 58, was elected to our Board in October 2014. Mr. O'Leary served as Executive Vice President and Chief Financial Officer of SPX Corporation, a global industrial and technological services and products company, from December 2004 until August 2012, when he retired. From October 1996 to December 2004 he served as Chief Financial Officer and Treasurer of SPX Corporation. Mr. O'Leary also serves as a director of PulteGroup, Inc., a homebuilding company and as a director of SPX Corporation. Mr. O'Leary has been selected to serve as a member of our Board of Directors due to his executive leadership experience as a chief financial officer, financial literacy and experience in finance and accounting, international experience, and governance and public company board experience.

**Defendant Sainz**

57. Defendant Maria Sainz ("Sainz") has served as a director of the Company since February 1, 2015. Defendant Sainz serves as a member of the Compliance and Compensation Committees. According to the 2016 Proxy, as of March 4, 2016, Defendant Sainz beneficially owned 7,417 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 4, 2016 was $27.83, Sainz beneficially owned about $206,415.11 worth of Halyard stock.

58. For the fiscal year ended December 31, 2015, Defendant Sainz received $210,000 in compensation from the Company. This included $70,000 in cash and $140,000 in stock.

59. The 2016 Proxy stated the following about Defendant Sainz:

> Maria Sainz, age 50, was elected to our Board effective February 1, 2015. Ms. Sainz has served as the President and CEO of Cardiokinetix, a medical device company pioneering a catheter- based treatment for heart failure, since May 2012. She was the President and CEO of Concentric Medical, Inc., a developer of minimally invasive products for the treatment of acute ischemic stroke, from April 2008 until May 2012. In October 2011, Concentric Medical was acquired by Stryker Corporation, a medical technology company, where she was named General Manager of the business unit of Stryker Neurovascular. From 2006 to 2008, Ms. Sainz led integration activities following the acquisition of Guidant Corporation by Boston Scientific. From February 2003 through July 2006, Ms. Sainz served as President of the Cardiac Surgery division of Guidant Corporation. From January 2001 through February 2003, Ms. Sainz served as Vice President, Global Marketing for the Vascular Intervention division of Guidant Corporation. From late 1998 through early 2001, Ms. Sainz served as Vice President of the Intermedics Cardiac Rhythm

> Management business of Guidant Corporation in Europe. Ms. Sainz also serves as a director of Orthofix International, N.V, a global medical device company, The Spectratenics Corporation, a cardiovascular technology company, and MRI Interventions, Inc., a medical device company. Ms. Sainz has been selected to serve as a member of our Board of Directors due to her leadership experience as a chief executive officer, knowledge of, and experience in, the healthcare industry, international experience, and public company board experience.

**<u>Defendant Shimer</u>**

60. Defendant Dr. Julie Shimer ("Shimer") has served as a director of the Company since October 2014. Defendant Shimer serves as Chair of the Compensation Committee and a member of the Compliance Committee. According to the 2016 Proxy, as of March 4, 2016, Defendant Shimer beneficially owned 8,225 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 4, 2016 was $27.83, Shimer beneficially owned about $228,901.75 worth of Halyard stock.

61. For the fiscal year ended December 31, 2015, Defendant Shimer received $225,000 in compensation from the Company. This included $85,000 in cash and $140,000 in stock.

62. The 2016 Proxy stated the following about Defendant Shimer:

> Dr. Julie Shimer, age 63, was elected to our Board in October 2014. Dr. Shimer is the Chairman of the Compensation Committee. She is currently a private investor and has 30 years of product development experience, including many years with major communications companies. From March 2007 to April 2012 she served as Chief Executive Officer of Welch Allyn, Inc., a manufacturer of

frontline medical products and solutions, having served on the board of directors beginning in July 2002. Previously, Dr. Shimer was President and Chief Executive Officer of Vocera Communications, Inc., a provider of wireless communications systems, also serving on the board of directors. She also has served as general manager at 3Com Corporation and Motorola and has been a product development leader at Motorola and AT&T Bell Laboratories. She has also served as the Chairwoman of Empire State Development Corp., the State of New York's economic development organization and as an advisor to two private companies, Kitchology, a mobile platform empowering families dealing with special diets through the power of technology and community, and CPLANE Networks, a leader in end-to-end data center and wide area network service orchestration that enables software-defined networking (SDN) and network function virtualization (NFV) services to be launched and managed in a single environment. She also serves on the boards of directors of three nonprofit organizations. Dr. Shimer also serves as a director of Netgear, Inc., a provider of home and small business network solutions, and EarthLink Holdings Corp., a leading managed network and cloud services provider. Dr. Shimer has been selected to serve as a member of our Board of Directors due to her leadership experience as a chief executive officer, knowledge of, and experience in, the healthcare industry, international experience and governance and public company board experience.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

63. By reason of their positions as officers, directors and/or fiduciaries of Halyard and because of their ability to control the business and corporate affairs of Halyard, the Individual Defendants owed Halyard and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Halyard in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Halyard and its shareholders so as to benefit all shareholders equally.

64. Each director and officer of the Company owes to Halyard and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

65. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Halyard, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

66. To discharge their duties, the officers and directors of Halyard were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

67. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Halyard, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also

officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Halyard's Board at all relevant times.

68. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to, *inter alia*, the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those events described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information, and had a duty to prevent the engagement in deceptive marketing of its products.

69. To discharge their duties, the officers and directors of Halyard were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Halyard were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Georgia, the

United States, and pursuant to Halyard's own Code of Conduct and internal guidelines;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Halyard conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Halyard and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Halyard's operations would comply with all laws and Halyard's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

70. Each of the Individual Defendants further owed to Halyard and the shareholders the duty of loyalty requiring that each favor Halyard's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

71. At all times relevant hereto, the Individual Defendants were the agents of each other and of Halyard and were at all times acting within the course and scope of such agency.

72. Because of their advisory, executive, managerial, and directorial positions with Halyard, each of the Individual Defendants had access to adverse, non-public information about the Company.

73. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Halyard.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

74. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

75. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and Section 14(a) of the Exchange Act, and the Individual Defendants' deceptive marketing and sales of the Company's products; (ii) conceal adverse information concerning the Company's operations, financial condition, competitors, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

76. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or with gross negligence to engage in deceptive marketing, engage in improper accounting methods, conceal material facts, fail to correct such misrepresentations, and violate applicable laws. During the Relevant Period, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did conceal the fact that the Company was reaching record revenue levels due to improper manipulation of financial information related to concessions provided to distributors. During the Relevant Period, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did engage in deceptive marketing. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority and approval of the Board, each of the Individual Defendants who are directors of Halyard was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

77. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of

the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

78. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Halyard, and was at all times acting within the course and scope of such agency.

## **CODE OF CONDUCT**

79. Pursuant to the Company's Code of Conduct, the Code of Conduct applies to:

> [e]ach … [employee] has the obligation to read and understand the Code of Conduct. The Code of Conduct applies to every Halyard Health employee around the world. The Code of Conduct also applies to members of the Board of Directors of Halyard Health. If a local custom, culture, or law sets a different standard than the Code, you should ask the Legal Department for guidance. We are each responsible for our own compliance with the Code, to report suspected violations, and to cooperate in the Company's investigation of potential violations.

80. The Code of Conduct provides, as to "WHY WE HAVE A CODE OF CONDUCT," that:

> At Halyard Health, our mission is to advance health and healthcare by preventing infection, eliminating pain and speeding recovery. Our HYH values are the principles and ideals that have made us who we are today and define the kind of company we want to be in the future. We are:

• **AUTHENTIC:** We believe a straightforward, honest and transparent approach can help cut through the complexities of today's healthcare environment. Guided by our noble purpose, we earn the trust of others each and every day by following through on our promises and always doing the right thing.

• **BOLD:** Driving healthcare forward demands an eye to the future. We are committed to helping our customers stay at the cutting edge of their field, advancing the industry one patient at a time. We have a bias for action that allows us to make decisions quickly, respond to customer needs and seize opportunities.

• **CARING:** We know that our products have an impact on patients' lives and our business impacts the broader healthcare system. That's why we build long-term relationships by acting in the best interests of our customers and going the extra mile to ensure they are equipped to provide the best care to their patients.

We believe that the way we do our business is as important as the business that we do. Operating with integrity and with high ethical standards is the Halyard Health way of doing business. The Code of Conduct reinforces our values by providing guidance for dealing with customers, suppliers, other employees, competitors and the public with integrity and in an ethical and appropriate manner. Living these values and demonstrating our HYH Behaviors of Build Trust, Make Decisions, Win Consistently, Think Customer, Continuously Improve and Build Talent are essential to our success.

81. As further proclaimed in the Code of Conduct:

Halyard Health's reputation for product safety and quality is one of our most valuable assets. We are committed to providing products that are safe and please our customers.

• The health, safety and well-being of healthcare professionals and patients are our primary concern. We will meet or exceed legal and regulatory requirements and industry standards for product safety and quality. We work every day to earn the trust of our healthcare professionals and patients through all our actions and decisions.

> • We are committed to producing safe, high quality products across all of our brands. We maintain the trust of our customers by designing and manufacturing superior products, starting with the purchase of our raw ingredients and continuing until the finished product is used by the customer.
>
> • Each one of us plays a role in providing our healthcare professionals and patients with the safe, high quality products they expect. Know the quality standards, policies, and procedures that apply to the products and activities at your location.
>
> • Never do anything that could undermine the trust that our customers place in us or could compromise the quality or safety of our products.
>
> • If you see something that could negatively affect the quality or safety of a Halyard Health product, speak up and report it immediately to your team leader or your facility, business unit or corporate quality/ product safety department.

82. The Code of Conduct additionally states:

> As a global company, Halyard Health is subject to the laws of all countries in which we operate. We are committed to complying with all applicable government laws, rules and regulations. It is important to remember that compliance with the Code reflects the minimum standard acceptable. Where local or specific provisions are relevant and require an even higher standard of conduct, the more stringent rules may apply (e.g. when interacting with Healthcare Professionals). Additionally, many countries sometimes apply their laws to Company operations and personnel outside of their borders. Always check with our Legal Department if you are not sure what laws apply to your situation.

83. In violation of the Code of Conduct, the Individual Defendants (as key officers and as members of the Company's Board) conducted little, if any, oversight of the Company's internal controls over public reporting of the Individual Defendants' schemes to market and sell defective products, issue materially false and misleading statements to the public and facilitate and disguise the Individual

Defendants' violations of law, including breaches of fiduciary duty, and unjust enrichment. In violation of the Code of Conduct, the Individual Defendants consciously disregarded their duties to (1) comply with the applicable laws and regulations, (2) protect corporate assets, (3) engage in fair dealing, (4) avoid using corporate opportunities for personal gain, (5) avoid conflicts of interest, (6) report violations of the Code of Conduct, (7) appropriately maintain the Company's books, records, accounts, and financial statements, and (8) make accurate filings with the SEC.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### The Individual Defendants Caused the Company to Conceal Material Information From Consumers and the Government and to Continue the Deceptive Sales of Defective Products

84. Halyard* MicroCool* AAMI Level 4 Breathable High Performance Surgical Gowns was introduced to the market in 2011 and was named Kimberly-Clark MicroCool* Breathable High Performance Surgical Gowns prior to Halyard Health's spin-off from Kimberly-Clark in 2014.

85. In the 510(k) submission to the FDA in connection with the gowns at issue, Kimberly-Clark represented to the FDA as follows:

> The Kimberly-Clark * MicroCool* Breathable High Performance Surgical Gowns, are sterile, single use surgical apparel intended to be worn by healthcare professionals **to help protect both the patient and the healthcare worker from the transfer of microorganisms, body fluids, and particulate**

> **matter.** The MicroCool Breathable High Performance Surgical Gowns meet the Level 4 requirements of the AAMI Liquid Barrier classifications
> ….
>
> The Kimberly-Clark * MicroCool* Breathable High Performance Surgical Gowns, has been tested in compliance with the requirements of Level 4 liquid barrier performance requirements of ANSI/AAMI PB70;2003 *"Liquid barrier performance and classification of protective apparel and drapes intended for use in health care facilities."* The MicroCool* Breathable High Performance Surgical Gown also meets the requirements of ASTM1671:2003 *Standard test method for resistance of materials used in protective clothing to penetration by blood-born pathogens using Phi-X174 bacteriophage penetration as a test system.* The MicroCool* Breathable High Performance Surgical Gown also meets the requirements of Flame Resistant CPSC 1610 Class 1. The MicroCool* Breathable High Performance Surgical Gown has also been tested in compliance with the biocompatibility requirements of ISO 10993 for surface devices with limited contact with breached or compromised surfaces. All results of testing met acceptance criteria.

(Emphasis added.)

86. After the spin-off, Halyard continued to provide the product under the brand name MicroCool * Breathable High Performance Surgical Gowns ("High Performance Gowns").

87. According to a poster entitled "Surgical Solutions Package Change Guide," only starting from May 2015, the branding, labeling, packaging, and documentation for all of the Company's products -- gowns, drapes, equipment covers and accessories -- were changed from Kimberly-Clark to Halyard. Even after the label and package change, the Company announced that their products and product codes would remain the same. Specifically, the Company represented that "You'll

continue to receive the SAME product, with the SAME CODES from the SAME PLANTS."

88. Thus from around 2011 to the present and continuing, Kimberly-Clark and the Company have promoted, marketed, and offered for sale the High Performance Gowns to health care facilities worldwide, including facilities across the country receiving funds from the United States and the various individual states.

89. At all the relevant times, for the purpose of marketing and selling its MICROCOOL* Breathable High Performance Surgical Gowns ("High Performance Gowns"), the Individual Defendants caused the Company to falsely represent the products to be impermeable, to claim that the products provide the highest level of protection from the transfer of bodily fluids, bacteria, and infection (i.e., Ebola) between patient and health care professional. In reality, the Company had knowledge that these gowns failed industry tests and do not meet relevant standards.

90. Beginning from around 2011 and continuing through the present, the Company represented to consumers and the general public that "HALYARD* MICROCOOL* Gown meets the AAMI Level 4 Liquid Barrier Standard."[2]

---

[2] *See* Halyard, *Microcool* Breathable High Performance Surgical Gown*, https://products.halyardhealth.com/surgical-solutions/surgical-gowns/breathable-high-performance-gowns/halyard-microcool-breathable-high-performance-surgical-gown-4576.html (last visited November 22, 2016); *See also* Halyard, Microcool* Breathable High Performance Surgical Gown With Secure-Fit* Technology, https://products.halyardhealth.com/surgical-solutions/surgical-gowns/breathable-

91. “AAMI” stands for the Association for the Advancement of Instrumentation. AAMI Level Liquid Barrier Standard wad developed to assist healthcare personnel and healthcare providers in the appropriate selection and use of surgical gowns, drapes, and other protective apparel. AAMI guidelines comprise a widely accepted system of classification for protective apparel and drapes based on liquid barrier performance. AAMI performance levels range from 1 (least protective) to 4 (most protective). Therefore, by claiming the Halyard High Performance Gowns meet the AAMI Level 4 Liquid Barrier Standard, the Individual Defendants caused the Company to represent that it “provides the highest barrier protection rating available for surgical gowns.”

92. The Company further represented that the High Performance Gowns provide level 4 liquid barrier in “critical zones.” The Company represented, in relevant part, that:

> HALYARD* MICROCOOL* Breathable High Performance Surgical Gowns provide Level 4 liquid barrier in zones A, B, and C.2,3 For surgical gowns, the critical zones are, at a minimum, the front area of the gown from chest to knees (area A) and the sleeves from the cuff to above the elbow (area B). The standard requires that the entire front of a surgical gown (Areas A, B, and C) provide a liquid barrier of at least Level 1. The back of the gown (area D) may be non-protective.

*Id.*

---

high-performance-gowns/halyard-microcool-breathable-high-performance-surgical-gown-with-secure-fit-technology.html (last visited November 22, 2016).

93. The Company has represented that the High Performance Gowns meet the following standards: (1) the ANSI/AAMI PB70 standard for liquid barrier performance; (2) the ASTM F1670 and ASTM F1671 standards for resistance of materials used in protective clothing; (3) the ASTM F1671 standard for bacteriophage penetration; and (4) the ENSO 22610 standard for resistance to wet microbial penetration.

94. ANSI/AAMI PB70 is defined in a document published by AAMI entitled "Liquid barrier performance and classification of protective apparel and drapes intended for use in healthcare facilities." The standard being discussed in the document establishes a system of classification for protective apparel and drapes used in healthcare facilities based on their liquid barrier performance and specifies related labeling requirements and standardized test methods for determining compliance. The standard is intended to ultimately assist end-users in determining the type(s) of protective product most appropriate for a particular task or situation.

95. ASTM F1670 and ASTM F1671 refer to standard test methods for the resistance of materials used in protective clothing to penetration by blood-borne pathogens. This test method is based on a test method for measuring resistance of chemical protective clothing materials to penetration by liquids. This test method is normally used to evaluate specimens from individual finished items of protective clothing and individual samples of materials that are candidates for items of

protective clothing. Finished items of protective clothing include gloves, arm shields, aprons, gowns, coveralls, hoods, and boots.

96. The Company made consistent statements to the consumers, the general public, and the FDA concerning the level of protection of the High Performance Gowns during the relevant times, even though it should not have. Since at least early 2013, it became apparent to Kimberly-Clark, and later to the Company, that the High Performance Gowns do not meet the relevant standards for liquid barrier protection and are at serious risk of causing physicians, health care workers, and patients to be unknowingly exposed to serious bacteria, viruses, and illnesses, including but not limited to Ebola.

97. In early 2013 at the latest, Kimberly-Clark and Halyard became aware of failed test results for the High Performance Gowns. ASTM F1671 tests of numerous random samples taken from multiple separate manufacturing lots, among other tests, were conducted. The High Performance Gowns failed each such test at rates far in excess of acceptable AAMI Level 3 and 4 standards. In fact, these tests revealed that many Gowns experienced catastrophic failures by allowing liquid, bacterial, and viral pathogens to penetrate the Gowns.

98. As a result of these failed test results, Kimberly-Clark and the Company knew that it is no longer a proper practice to claim High Performance Gowns as

meeting AAMI Level 4 standard, or ASTM F1670 and F1671 testing standards, and/or satisfying ANSI/AAMI PB70 standard.

99. Kimberly-Clark and the Company also knew for certain that their representations to the FDA concerning the Gowns were false.

100. Despite having such knowledge, neither Kimberly-Clark nor the Company has taken any sort of immediate actions to protect the consumers and the general public. Actions that Kimberly-Clark and the Company should have taken include, but are not limited to, the following:

- announcing that the High Performance Gowns did not meet the relevant standards;
- stopping the sales of the High Performance Gowns unless and until their defects are fixed and recalling the gowns that have already been sold and/or caused to have been placed in the distribution channel;
- alerting Federal, State and local governments and the FDA; and
- alerting health care providers, physicians and patients worldwide.

101. Instead of taking any of the foregoing actions, the Individual Defendants and Kimberly-Clark executives caused Kimberly-Clark and the Company to place profits over product quality and the protection of the general public at large by affirmatively covering-up and/or delaying the disclosure of the Gown defects. In

addition, Kimberly-Clark, and later the Company, continued selling the defective products irrespective of the potentiality of inflicting serious infection and bodily harm to health care providers, physicians, and patients and of their cheating their customers and the U.S. government.

102. That the Individual Defendants have failed and continue to fail to cause Halyard to disclose the defects of the High Performance Gowns is also evidenced by the content posted on the Company's website. Halyard's website states, under the heading "Kimberly-Clark Pandemic Preparedness Customer Letter":

> As concerns around the spread of the Ebola virus continue to grow, the number of inquiries we receive at Kimberly-Clark regarding recommendations for PPE and our plans for Pandemic Preparedness are growing in tandem. Therefore, we want to proactively provide you with guidance on preparing for a pandemic as well as solutions for proper PPE. We are providing you with a clinical Kimberly-Clark Ebola Virus Precautions Brief and a Kimberly-Clark Personal Protection Solutions guide.

103. Below this statement, there is a link for visitors to download the "Halyard Personal Protection Solutions Guide," in which the High Performance Gowns are among the list of Personal Protection Equipment products ("PPE") recommended to the consumers for the purpose of fighting against the Ebola virus.

104. Halyard's website also provides a link to a document titled "Kimberly-Clark Ebola Virus Disease (EVD) Precautions Brief", which provides a list of recommendations for personal protection from the Ebola virus, as well as the use of "appropriate personal protective equipment (PPE)." With respect to surgical gowns,

the Company advises health care professionals to use "Level 4" gowns when working with Ebola patients.

105. In short, despite knowing since at least 2013 that the High Performance Gowns failed industry tests and were at risk for allowing bodily fluid, bacteria, and other harmful matter to pass between patients and health care professionals, the Company, under the Individual Defendants' direction and on their watch, has recommended these gowns for use in high-risk medical environments, including when treating Ebola. Aside from this, the Individual Defendants also caused the Company to cover up disclosures from the FDA and to continue the sale or distributions of defective products. In choosing profits over the truth and safety, the Individual Defendants have caused the Company to put unknowing physicians, health care professionals, and patients at risk of exposure to serious bacteria, viruses, and illnesses.

**<u>SEC Rule Regulating Material Disclosures</u>**

106. Pursuant to Item 303 of Regulation S-K (17 C.F.R. § 229,303), and the interpretative releases related thereto, issuers are required to disclose events or uncertainties that have had, or are reasonably likely to cause, the issuer's financial information not to be indicative of future operating results. Any adverse events and/or uncertainties associated with the success of the MICROCOOL gown were reasonably likely to have a material impact on Halyard's profitability. The Individual Defendants

breached their duties by causing the Company's statements in SEC filings and press releases to fail to disclose this material information.

**Material Misrepresentations and Omissions During the Relevant Period**

107. On October 21, 2014, Halyard filed a Report on Form 8-K announcing the Company's financial and operating results for the quarter ended September 30, 2014 (the "10-21-2014 8-K"). For the quarter, Defendants reported net sales of $279.2 million for its Surgical and Infection Prevention segment, compared to net sales of $287.0 million for the same period in the prior year.

108. A Form 8-K is the "current report" companies must file with the SEC to announce major events relevant to shareholders. The instructions for Form 8-K describe the types of events that trigger a public company's obligation to file a current report, include, but are not limited to, results of Operations and Financial Condition, Material Impairments and other events that the registrant considers to be of importance to security holders.[3]

109. Despite having the opportunity to do so, nowhere did the 10-21-2014 8-K discuss any concerns of consumer fraud, design defect or product liability attributed to its MICROCOOL gown. Yet, since 2013 at the latest, the Individual

---

[3] *See* https://www.sec.gov/answers/form8k.htm.

Defendants knew or deliberately turned a blind eye to the fact that its MICROCOOL Gown had failed industry tests of impermeability to blood and microbes.

110. On November 20, 2014, Halyard filed a Quarterly Report on Form 10-Q with the SEC for the quarter ended September 30, 2014 (the "Q3 2014 10-Q"). The Q3 2014 10-Q reiterated the financial and operating results previously announced in the 10-21-2014 8-K. In the Q3 2014 10-Q, the Company also stated, in relevant part:

> Our products and solutions are designed to address some of today's most important healthcare needs, namely ***preventing infections*** and reducing the use of narcotics while helping patients move from surgery to recovery. ***We market and support the efficacy, safety, and economic benefit of our products with a significant body of clinical evidence.***

(Emphasis added.)

111. Nowhere did the Q3 2014 10-Q discuss any concerns or allegations of consumer fraud, design defect, or product liability attributed to its MICROCOOL gown.

112. In the Q3 2014 10-Q's section on "Legal Matters," the Individual Defendants caused Halyard not to disclose even the threat of legal claims connected to the testing, manufacturing, marketing, sales, and distribution of the MICROCOOL surgical gowns despite that the First Qui Tam Action and the Consumer Class Action were already pending.

113. Defendants Abernathy and Voskuil signed the Q3 2014 10-Q.

114. Attached to the Q3 2014 10-Q were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Abernathy and Voskuil attesting to the accuracy of the Q3 2014 10-Q.

115. The Company's SOX certifications contain the following attestations:

1. I have reviewed this quarterly report on Form 10-Q of Halyard Health, Inc. (the "registrant");

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of

> financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
>
> c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>
> d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
>
> 5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
>
> a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
>
> b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

116. On March 4, 2015, Halyard issued a press release and filed a Current Report on Form 8-K with the SEC announcing its financial and operating results for the quarter and year ended December 31, 2014 (the "3-4-2014 8-K"). In the 3-4-2014 8-K and associated press release, Halyard reported net sales of $1.14 billion for its Surgical and Infection Prevention segment, compared to net sales of $1.15 billion for 2013, a decrease of 2%.

117. Despite having the opportunity to do so, nowhere did the 3-4-2014 8-K or associated press release discuss any concerns or allegations of consumer fraud, design defect or product liability attributed to its MICROCOOL gown. Yet the Individual Defendants were on notice that the two Qui Tam Actions and the Consumer Class Action had already been filed.

118. On March 13, 2015, Halyard filed its Annual Report for the quarter and year ended December 31, 2014 on Form 10-K with the SEC (the "2014 10-K"). The 2014 10-K reiterated the financial and operating results previously announced in the 3-4-2014 8-K. The 2014 10-K also stated, in relevant part:

> ***We may incur product liability losses, litigation liability, product recalls, safety alerts or regulatory action associated with our products which can be costly and disruptive to our business.***
>
> The risk of product liability claims is inherent in the design, manufacture and marketing of the medical products of the type we produce and sell. A number of factors could result in an unsafe condition or injury to, or death of, a patient with respect to the products that we manufacture or sell, including physician technique and experience in performing the relevant surgical procedure, component failures, manufacturing flaws, design defects or inadequate disclosure of product-related risks or information.
>
> We are one of several manufacturers of continuous infusion medical devices, such as our ON-Q PAINBUSTER pain pumps, that are involved in several different pending or threatened litigation matters brought by multiple plaintiffs alleging that use of the continuous infusion device to deliver anesthetics directly into a synovial joint after surgery resulted in postarthroscopic glenohumeral chondrolysis, or a disintegration of the cartilage covering the bones in the joint (typically, in the shoulder). Plaintiffs generally seek monetary damages and attorneys' fees. While Kimberly-Clark retained the liabilities related to these matters that were asserted prior to the Spin-off, the

> distribution agreement between us and Kimberly-Clark provided that we indemnify Kimberly-Clark and assume the liability for any such claims and causes of actions arising after the distribution. There can be no assurance that additional related or unrelated claims or other product liability claims, including potential class actions, will not be made that allege that our products have resulted in or could result in an unsafe condition or injury. Any of these proceedings, regardless of the merits, may result in substantial costs, the diversion of management's attention from other business concerns, additional restrictions on our sales or the use of our products, or settlement payments and adjustments not covered by or in excess of insurance. Insurance for these types of claims varies in cost and can be difficult to obtain on terms acceptable to us or at all.
>
> In addition to product liability claims and litigation, an unsafe condition or injury to, or death of, a patient associated with our products could lead to a recall of, or issuance of a safety alert relating to, our products, or suspension or delay of regulatory product approvals or clearances, product seizures or detentions, governmental investigations, civil or criminal sanctions or injunctions to halt manufacturing and distribution of our products. Any one of these could result in significant costs and negative publicity resulting in reduced market acceptance and demand for our products and harm our reputation. In addition, a recall or injunction affecting our products could temporarily shut down production lines or place products on a shipping hold.
>
> All of the foregoing types of legal proceedings and regulatory actions are inherently unpredictable and, regardless of the outcome, could disrupt our business, result in substantial costs or the diversion of management attention and could have a material adverse effect on our business, results of operations, financial condition and cash flows.

(Emphasis in original.)

119. Nowhere did the 2014 10-K discuss any concerns or allegations of consumer fraud, design defect, or product liability attributed to its MICROCOOL gown.

120. Despite acknowledging the material adverse effect legal proceedings could have on the Company's financial condition and cash flow, the Individual Defendants caused Halyard not to disclose even the threat of legal claims connected to the testing, manufacturing, marketing, sales, and distribution of the MICROCOOL surgical gowns despite that the two Qui Tam Actions and the Consumer Class Action were already pending.

121. All of the Individual Defendants, except for Defendant Hawkins, signed the 2014 10-K.

122. Attached to the 2014 10-K were SOX certifications signed by Defendants Abernathy and Voskuil attesting to the accuracy of the report, which were substantially similar to those set forth above.

123. On March 16, 2015, the Company filed with the SEC a Proxy Statement on Form DEF 14A (the "2015 Proxy"). The 2015 Proxy stated, in relevant part:

> Our governance structure and processes are based on a number of important governance documents including our Code of Conduct, Certificate of Incorporation, Corporate Bylaws, Corporate Governance Policies and our Board Committee Charters. These documents, which are available in the investors section of our website at www.halyardhealth.com, guide the Board and our management in the execution of their responsibilities.
>
> Halyard Health believes that there is a direct connection between good corporate governance and long-term, sustained business success, and we believe it is important to uphold sound governance practices. As such, the Board reviews its governance practices and documents on an ongoing basis, considering changing regulatory requirements, governance trends, and issues raised by our stockholders. After careful evaluation, we may periodically make

> governance changes in view of these matters to maintain current good governance practices and promote shareholder value.
>
> We believe we are in compliance with all applicable corporate governance requirements of the NYSE, the SEC, the Sarbanes-Oxley Act of 2002 and the provisions of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 that have become effective as of the date of this proxy statement.

124. The 2015 Proxy also provided information about the Company's creation of a Disclosure Committee. The 2015 Proxy stated as follows:

> *Disclosure Committee.* We have established a Disclosure Committee to assist in fulfilling our obligations to maintain disclosure controls and procedures and to coordinate and oversee the process of preparing our periodic securities filings with the SEC. This committee is composed of members of management and is chaired by our Vice President and Controller.

125. Despite the 2015 Proxy's reporting on the creation of the Disclosure Committee, the Individual Defendants caused Halyard not to disclose in the 2015 Proxy even the threat of legal claims connected to the testing, manufacturing, marketing, sales, and distribution of the MICROCOOL surgical gowns or the threat of legal claims connected to the failure to disclose the foregoing claims despite that the two Qui Tam Actions and the Consumer Class Action were already pending.

126. The Individual Defendants also caused the Company to fail to disclose in the 2015 Proxy that the High Performance Gowns failed industry tests and were at risk for allowing bodily fluid, bacteria, and other harmful matter to pass between patients and health care professionals, and that the Company was illegally engaged in the sale, marketing and distributions of its defective products.

127. The Individual Defendants also caused the 2015 Proxy to be false and misleading in that it stated that the Individual Defendants upheld “sound governance practices” and were in compliance with “all applicable corporate governance requirements of the NYSE, the SEC, the SOX, and the provisions of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010.” Indeed, due to the Individual Defendants’ actions with respect to the deceptive sale, marketing and distribution of the defective MICROCOOL surgical gowns, the Individual Defendants failed to practice and/or uphold sound corporate governance practices.

128. On May 4, 2015, the Company issued a press release and filed a Current Report on Form 8-K with the SEC, announcing Halyard’s financial and operating results for the quarter ended March 31, 2015 (the “5-4-2015 8-K”). For the quarter, Halyard reported net sales of $254.8 million for its Surgical and Infection Prevention segment, compared to net sales of $275.5 million for the same period in the prior year, a decrease of 7.5%.

129. Despite having the opportunity to do so, nowhere did the 5-4-2015 8-K or associated press release discuss any concerns or allegations of consumer fraud, design defect or product liability attributed to its MICROCOOL gown. Yet the Individual Defendants were on notice that the two Qui Tam Actions and the Consumer Class Action had already been filed.

130. On May 5, 2015, the Company filed a Quarterly Report on Form 10-Q with the SEC for the quarter ended March 31, 2015 (the “Q1 2015 10-Q”). The Q1 2015 10-Q reiterated the financial and operating results previously announced in the 5-4-2015 8-K. In the Q1 2015 10-Q, Defendants also stated, in part: “Our products and solutions are designed to address some of today’s most important healthcare needs, namely preventing infections and reducing the use of narcotics while helping patients move from surgery to recovery. We market and support the efficacy, safety, and economic benefit of our products with a significant body of clinical evidence.”

131. In the Q1 2015 10-Q’s section on “Commitments and Contingencies,” despite acknowledging the material adverse effect legal proceedings could have on the Company’s financial condition and cash flow, the Individual Defendants caused Halyard not to disclose even the threat of legal claims connected to the testing, manufacturing, marketing, sales, and distribution of the MICROCOOL surgical gowns despite that the two Qui Tam Actions and the Consumer Class Action were already pending.

132. Defendants Abernathy and Voskuil signed the Q1 2015 10-Q.

133. Attached to the Q1 2015 10-Q were SOX certifications signed by Defendants Abernathy and Voskuil attesting to the accuracy of the report, which were substantially similar to those set forth above.

134. On August 4, 2015, Halyard issued a press release and filed a Current Report on Form 8-K with the SEC, announcing its financial and operating results for the quarter ended June 30, 2015 (the "8-4-2015 8-K"). For the quarter, Halyard reported net sales of $255.3 million for its Surgical and Infection Prevention segment, compared to net sales of $285.5 million for the same period in the prior year, a decrease of 10.6%.

135. Despite having the opportunity to do so, nowhere did the 8-4-2015 8-K or associated press release discuss any concerns or allegations of consumer fraud, design defect or product liability attributed to its MICROCOOL gown. Yet the Individual Defendants were on notice that the two Qui Tam Actions and the Consumer Class Action had already been filed and the VA OIG subpoena was served.

136. On August 12, 2015, Halyard filed a Quarterly Report on Form 10-Q with the SEC for the quarter ended June 30, 2015 (the "Q2 2015 10-Q"). The Q2 2015 10-Q reiterated the financial and operating results previously announced in the 8-4-2015 8-K. In the Q2 2015 10-Q, the Company also stated, in relevant part:

> Our products and solutions are designed to address some of today's most important healthcare needs, namely ***preventing infections*** and reducing the use of narcotics while helping patients move from surgery to recovery. ***We market and support the efficacy, safety, and economic benefit of our products with a significant body of clinical evidence.***

(Emphasis added.)

137. In the Q2 2015 10-Q's section on "Commitments and Contingencies," the Company finally disclosed that the Consumer Class Action was pending and that the Company was served with the subpoena by the VA OIG. Yet the Individual Defendants continued to cause the Company to fail to disclose that the High Performance Gowns failed industry tests and were at risk for allowing bodily fluid, bacteria, and other harmful matter to pass between patients and health care professionals, and that the Company was illegally engaged in the sale, marketing and distributions of its defective products.

138. Defendant Voskuil and non-party Vice President and Controller Renato Negro ("Negro") signed the Q2 2015 10-Q.

139. Attached to the Q2 2015 10-Q were SOX certifications signed by Defendants Abernathy and Voskuil attesting to the accuracy of the report, which were substantially similar to those set forth above.

140. On November 3, 2015, Halyard issued a press release and filed a Current Report on Form 8-K with the SEC, announcing its financial and operating results for the quarter ended September 30, 2015 (the "11-13-2015 8-K"). For the quarter, Halyard reported net sales of $257.4 million for its Surgical and Infection Prevention segment, compared to net sales of $279.2 million for the same period in the prior year, a decrease of 7.8%.

141. Despite knowing the truth or deliberately turning a blind eye to the truth, the Individual Defendants continued to cause the Company to fail to disclose that the High Performance Gowns failed industry tests and were at risk for allowing bodily fluid, bacteria, and other harmful matter to pass between patients and health care professionals, and that the Company was illegally engaged in the sale, marketing and distributions of its defective products.

142. On November 4, 2015, Halyard filed a Quarterly Report on Form 10-Q with the SEC for the quarter ended September 30, 2015 (the "Q3 2015 10-Q"). The Q3 2015 10-Q reiterated the financial and operating results previously announced in the 11-3-2015 8-K. In the Q3 2015 10-Q, the Company also stated, in relevant part:

> Our products and solutions are designed to address some of today's most important healthcare needs, namely ***preventing infections*** and reducing the use of narcotics while helping patients move from surgery to recovery. ***We market and support the efficacy, safety, and economic benefit of our products with a significant body of clinical evidence.***

(Emphasis added.)

143. In the Q3 2015 10-Q's section on "Commitments and Contingencies," the Company disclosed that the Consumer Class Action was pending, that the Company was served with the subpoena by the VA OIG, and that the Company was being investigated by the DOJ. Yet the Individual Defendants continued to cause the Company to fail to disclose that the High Performance Gowns failed industry tests and were at risk for allowing bodily fluid, bacteria, and other harmful matter to pass

between patients and health care professionals, and that the Company was illegally engaged in the sale, marketing and distributions of its defective products.

144. Defendant Voskuil and non-party Negro signed the Q3 2015 10-Q.

145. Attached to the Q3 2015 10-Q were SOX certifications signed by Defendants Abernathy and Voskuil attesting to the accuracy of the report, which were substantially similar to those set forth above.

146. On February 29, 2016 Halyard issued a press release and filed a Current Report on Form 8-K with the SEC, announcing its financial and operating results for the year ended December 31, 2015 (the "2-29-2016 8-K"). For the year, Halyard reported net sales of $1.03 billion for its Surgical and Infection Prevention segment, compared to net sales of $1.14 billion in 2014, a decrease of 9.6%.

147. Despite knowing the truth or deliberately turning a blind eye to the truth, the Individual Defendants continued to cause the Company to fail to disclose that the High Performance Gowns failed industry tests and were at risk for allowing bodily fluid, bacteria, and other harmful matter to pass between patients and health care professionals, and that the Company was illegally engaged in the sale, marketing and distributions of its defective products.

148. On February 29, 2016, Halyard filed its Annual Report on Form 10-K with the SEC for the quarter and year ended December 31, 2015 (the "2015 10-K").

The 2015 10-K reiterated the financial and operating results previously announced in the 2-29-2016 8-K.

149. In the 2015 10-K's section on "Legal Proceedings," the Company disclosed that the Consumer Class Action was pending, that the Company was served with the subpoena by the VA OIG, and that the Company was being investigated by the DOJ. Yet the Individual Defendants continued to cause the Company to fail to disclose that the High Performance Gowns failed industry tests and were at risk for allowing bodily fluid, bacteria, and other harmful matter to pass between patients and health care professionals, and that the Company was illegally engaged in the sale, marketing and distributions of its defective products.

150. All of the Individual Defendants and non-party Negro signed the 2015 10-K.

151. Attached to the 2015 10-K were SOX certifications signed by Defendants Abernathy and Voskuil attesting to the accuracy of the report, which were substantially similar to those set forth above.

152. On March 11, 2016, the Company filed with the SEC a Schedule 14A on Form DEF 14A (the "2016 Proxy"). The 2016 Proxy stated, in relevant part:

> Our governance structure and processes are based on a number of important governance documents including our Code of Conduct, Certificate of Incorporation, Corporate Bylaws, Corporate Governance Policies and our Board Committee Charters. These documents, which are available in the Investor's section of our website at www.halyardhealth.com, guide the Board

> and our management in the execution of their responsibilities.
>
> The Company believes that there is a direct connection between good corporate governance and long-term, sustained business success, and we believe it is important to uphold sound governance practices. As such, the Board reviews its governance practices and documents on an ongoing basis, considering changing regulatory requirements, governance trends, and issues raised by our stockholders. After careful evaluation, we may periodically make governance changes in view of these matters to maintain current good governance practices and promote shareholder value.
>
> We believe we are in compliance with all applicable corporate governance requirements of the NYSE, the SEC, the Sarbanes-Oxley Act of 2002 and the provisions of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 that have become effective as of the date of this proxy statement.

153. The Individual Defendants continued to cause the Company to fail to disclose in the 2016 Proxy that the High Performance Gowns failed industry tests and were at risk for allowing bodily fluid, bacteria, and other harmful matter to pass between patients and health care professionals, and that the Company was illegally engaged in the sale, marketing and distributions of its defective products.

154. The Individual Defendants also caused the 2015 Proxy to be false and misleading in that it stated that the Individual Defendants upheld "sound governance practices" and were in compliance with "all applicable corporate governance requirements of the NYSE, the SEC, the SOX, and the provisions of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010." Indeed, due to the Individual Defendants' actions with respect to the deceptive sale, marketing and

distribution of the defective MICROCOOL surgical gowns, the Individual Defendants failed to practice and/or uphold sound corporate governance practices.

***60 Minutes* Exposes MICROCOOL to the World**

155. On May 1, 2016, the Company was the subject of a *60 Minutes* report that Kimberly-Clark and Halyard had knowingly provided defective MICROCOOL surgical gowns to U.S. workers at the height of the Ebola crisis. In an interview with Anderson Cooper, Bernard Vezeau ("Vezeau"), the global strategic marketing director for MICROCOOL, blew the whistle on Halyard, accusing it of providing defective MICROCOOL surgical gowns, meant to protect workers from blood transmitted diseases, to health care workers during the Ebola outbreak of 2014.

156. The show reported that the gowns had faulty seams, regularly leaked, and penetrable by outside pathogens.

157. Vezeau confirmed that when the MICROCOOL gowns were pressure tested, they would leak, especially at the seams.

158. Tests performed by an independent, certified laboratory in 2012 also found that the sleeves of 77% of MICROCOOL gowns failed. The tests were done at the request of one of Kimberly-Clark's competitors, Cardinal Health.[4]

---

[4] Cardinal Health, Inc. is a Fortune 500 health care services company based in Dublin, Ohio. The company specializes in distribution of pharmaceuticals and medical products, serving more than 100,000 locations. Cardinal Health provides medical products to over 75 percent of hospitals in the United States.

159. Vezeau said things became difficult for him at the Company as the gowns were being recommended for use in handling Ebola and "aggressively marketed" during the outbreak. "We put a full court press to drive MICROCOOL sales. We told hospitals to stock up on our MICROCOOL products. We told 'em to have at least 8 to 12 weeks of product on hand. And that's when things became very difficult for me," Vezeau told *60 Minutes*.

160. But the MICROCOOL gowns were not consistently meeting industry standards, Vezeau said. And neither customers or the FDA were being notified of the failures.

161. "Because Kimberly-Clark knew that if they -- they told customers, it would cost us a lot of business," Vezeau told *60 Minutes*.

162. The *60 Minutes* investigators said that at hospitals like UF Health in Jacksonville, they we found surgeons who said they repeatedly experienced strike-through, where blood gets through the gowns onto the skin. Some surgeons were so upset they took pictures of their bloody arms and gowns and sent them to the company. Vezeau said in addition to strike-through, users complained of ties and sleeves falling off during procedures. Vezeau told *60 Minutes* that Halyard executives were not concerned about these problems.

163. As reported in *60* Minutes, Halyard acknowledged its defects with the MICROCOOL gown in a PowerPoint presentation "that identifies a year-and-a-half

'gap in sleeve seams passing' the industry test." Halyard's Chief Operating Officer, Chris Lowery, acknowledged having seen this PowerPoint. During that year-and-a-half 'gap, the company sold thousands of the gowns to the Centers for Disease Control and Prevention's Strategic National Stockpile of medical supplies, the report said.

164. As a direct consequence of these revelations, Halyard stock dropped $1.21 per share, or 4.3%, to close at $26.95 per share on May 2, 2016.

165. As a result of the Individual Defendants' actions, the Company has suffered serious damages, which include (but are not limited to) damages arising from the two Qui Tam Actions, the Consumer Class Action, the Securities Class Action, the VA OIG subpoena, the DOJ investigation, internal investigations, and the loss of reputation and industry standing. Further, as a result of Defendants' actions, the Company may become the subject of future investigations and litigation by individuals, as well as governmental and non-governmental entities.

**Summary of the Individual Defendants' Wrongful Conduct**

166. In breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the above-alleged internal control failures, and caused or allowed the illicit activity described herein (which ultimately led the Company to become the subject of the litigations and subpoenas alleged herein), and willfully or recklessly caused or permitted the Company to make false and misleading statements of

material fact, as well as to omit statements of material fact, in the Company's SEC filings and press releases.

167. Specifically, the Individual Defendants have willfully or recklessly caused the Company to conceal material information concerning the quality of the High Performance Gowns from the consumers, the general public, and the government. The Individual Defendants also failed to take any actions to halt the marketing, sale, and distribution of the defective products, and thus put unknowing physicians, health care professional, and patients at danger of exposure to serious bacteria, viruses, and illnesses, and subjected the Company to a great amount of liabilities and potential liabilities.

168. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact that falsely stated and/or failed to disclose that under the Individual Defendants' direction and on their watch: (i) the Company's MICROCOOL surgical gowns consistently failed effectiveness tests and failed to meet industry standards; (ii) complaints were frequently received and major litigation proceedings and federal investigations were commenced concerning the quality, marketing and sale of the Company's MICROCOOL surgical gowns; and (iii) Kimberly-Clark and Halyard had knowingly marketed, sold, and distributed defective MICROCOOL surgical gowns, including to U.S. workers during the Ebola crisis.

169. In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

## DAMAGES TO HALYARD

170. As a direct and proximate result of the Individual Defendants' conduct, Halyard will lose and expend many millions of dollars.

171. Such expenditures include, but are not limited to, legal fees and potential payments made that are associated with the two Qui Tam Actions, the Consumer Class Action, and the Securities Class Action, amounts paid to outside lawyers, accountants, and investigators in connection to these actions, including pursuant to Halyard's Indemnification Obligation.

172. Such losses include, but are not limited to, Company costs and fees and potential liability associated with the VA OIG subpoena and investigation, the DOJ investigation.

173. Such costs include, but are not limited to, compensation, bonuses, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

174. Such losses also include losses of revenues caused by customers' loss of trust in the Company's business and products.

175. Additional losses include those caused by noncompliance with NYSE rules and may also include those caused by the Company's potentially being delisted from the NYSE.

176. As a direct and proximate result of the Individual Defendants' conduct, Halyard has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

177. Plaintiff brings this action derivatively and for the benefit of Halyard to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Halyard and unjust enrichment, as well as the aiding and abetting thereof.

178. Halyard is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

179. Plaintiff is, and at all relevant times has been, a Halyard shareholder. Plaintiff will adequately and fairly represent the interests of Halyard in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

180. Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein. A pre-suit demand on the Board of Halyard is futile and, therefore, excused. At the time of filing of this action, the Board consists of Individual Defendants Abernathy, Blackford, Byrnes, Dollens, Fields, Hawkins, O'Leary, Sainz and Shimer (collectively, the "Directors").

181. Plaintiff need only allege demand futility as to five of the nine Directors that are on the Board at the time this action commenced.

182. Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of their engagement, either knowingly or recklessly, in schemes to make false and misleading statements and omissions of material fact as alleged above, to conceal material information concerning the quality of the High Performance Gowns from the consumers, the general public, and the government, and to fail to take any actions to halt the marketing, sale, and distribution of the defective products, and thus put unknowing physicians, health care professional, and patients at danger of exposure to serious bacteria, viruses, and illnesses, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

183. The vast majority of the Board holds positions on specific Board committees.

184. As reported on the Company's website, the Compliance Committee has the following responsibilities:

> The Compliance Committee shall: (1) oversee and monitor matters relating to the Corporation's compliance with applicable laws and regulations throughout the world ("Compliance") other than those relating to matters reserved for the Audit Committee, and (2) oversee matters relating to sustainability, corporate social responsibilities and corporate citizenship. The Compliance Committee shall have the authority to retain special legal, accounting or other consultants to advise the Compliance Committee. The Compliance Committee may request any officer or employee of the Corporation or the Corporation's outside counsel to attend a meeting of the Compliance Committee or to meet with any members of, or consultants to, the Compliance Committee.

185. As reported on the Company's website, the Audit Committee has the following responsibilities:

> The Audit Committee shall assist the Board in fulfilling its oversight responsibilities to stockholders, the investment community and others for monitoring (1) the quality and integrity of the financial statements of the Corporation; (2) the Corporation's financial reporting compliance; (3) the independence, qualification and performance of the Corporation's independent auditors; and (4) the performance of the Corporation's internal auditors. The Audit Committee shall have the authority to retain special legal, accounting or other consultants to advise the Audit Committee. The Audit Committee may request any officer or employee of the Corporation or the Corporation's outside counsel or independent auditors to attend a meeting of the Audit Committee or to meet with any members of, or consultants to, the Audit Committee.

186. As reported on the Company's website, the Compensation Committee has the following responsibilities:

> The Compensation Committee shall have responsibility to advise and consult with management regarding leadership development and key organizational effectiveness and engagement policies as well as oversight of compensation policies designed to align compensation with the Corporation's overall business strategy, values and management initiatives. These policies are intended to (1) reward executives for long-term strategic management and enhancement of stockholder value; (2) support a performance-oriented environment that rewards achievement of internal Corporation goals and recognizes the Corporation's performance compared to the performance of similarly situated companies; (3) attract and retain executives whose abilities are considered essential to the long-term success and competitiveness of the Corporation through the Corporation's salary administration program; and (4) align the financial interest of the Corporation's executives with those of stockholders.

187. As reported on the Company's website, the Governance Committee has the following responsibilities:

> The Governance Committee shall (1) oversee the process by which individuals are nominated to become board members, and (2) oversee matters of corporate governance, including advising the Board on matters of (A) board organization, membership and function; and (B) committee structure and membership. The Governance Committee shall have the authority to retain special legal, accounting or other consultants to advise the Governance Committee and to assist it identifying suitable potential board nominees. The Governance Committee may request any officer or employee of the Corporation or the Corporation's outside counsel to attend a meeting of the Governance Committee or to meet with any members of, or consultants to, the Governance Committee.

188. Additional reasons that demand on Defendant Abernathy is futile follow. Defendant Abernathy is the Company's Chief Executive Officer and Chairman of the Board, and is thus, as the Company acknowledges, a non-independent director. Indeed, he receives many millions of dollars in compensation from the Company annually; for the fiscal year ended December 31, 2015, Defendant Abernathy

received $5,595,758 in compensation from the Company. Defendant Abernathy was ultimately responsible for all of the wrongful conduct described herein, including the deceptive marketing, the Company's operations and internal controls, all of the false and misleading statements and omissions that were made, including those contained in the Company's SEC filings, all of which he signed, and including many of which he personally made. Defendant Abernathy's large Company stock holding, worth about $5.3 million, reveals his interest in keeping the Company's stock price as high as possible. Moreover, Defendant Abernathy is a defendant in the Securities Class Action. Defendant Abernathy conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the schemes described herein, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, too, Defendant Abernathy breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

189. Additional reasons that demand on Defendant Fields is futile follow. Defendant Fields was Chair of the Audit Committee during the Relevant Period and is thus especially culpable for the fraud alleged herein. She conducted little, if any, oversight of the Company's internal controls over public reporting of financial

statements and of the Company's engagement in the schemes described herein, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Moreover, she was the maker of many of the false statements and omissions of material fact that are alleged herein as she signed the 2014 10-K and the 2015 10-K. Thus, for these reasons, too, Defendant Fields breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

190. Additional reasons that demand on Defendant Blackford is futile follow. Defendant Blackford was a member of the Audit Committee during the Relevant Period and is thus especially culpable for the fraud alleged herein. He conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the schemes described herein, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, he was the maker of many of the false statements and omissions of material fact that are alleged herein as he signed the 2014 10-K and the 2015 10-K. Thus, for these reasons, too, Defendant Blackford breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

191. Additional reasons that demand on Defendant O'Leary is futile follow. Defendant O'Leary was a member of the Audit Committee during the Relevant Period and is thus especially culpable for the fraud alleged herein. As a member of the Corporate Governance and the Audit Committee, he conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the schemes described herein, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, he was the maker of many of the false statements and omissions of material fact that are alleged herein as he signed the 2014 10-K and the 2015 10-K. Thus, for these reasons, too, Defendant O'Leary breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

192. Additional reasons that demand on Defendant Byrnes is futile follow. As a member of the Compliance Committee, he was required to provide oversight and monitor consumer protection, ethics, quality, recalls, safety, health and safety, and review on a regular basis litigation matters filed against the Corporation related to alleged violations of laws and regulations, and his failure to properly do so and his failure to cause the Company to disclose pending litigation and investigations make him especially culpable for the wrongful conduct described herein. Moreover, he was

the maker of many of the false statements and omissions of material fact that are alleged herein as he signed the 2014 10-K and the 2015 10-K. Also, as a member of the Compensation Committee, he was charged with evaluating the CEO's performance, and his failure to properly do so makes him especially culpable for the wrongful conduct described herein. Importantly, Defendant Byrnes is not independent as he was involved in a related party transaction with the Company. The transaction was between the Company and Lincare Corporation ("Lincare"), at which Defendant Byrnes served as the CEO (and a director) through February 2015. The Company's sales of products to Lincare prior to Defendant Byrnes' resignation were $438,408. Considering the above facts, Defendant Byrnes would not be able to impartially consider a demand. Thus, for these reasons, too, Defendant Byrnes breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

193. Additional reasons that demand on Defendant Hawkins is futile follow. As Chair of the Compliance Committee, he was required to provide oversight and monitor consumer protection, ethics, quality, recalls, safety, health and safety, and review on a regular basis litigation matters filed against the Corporation related to alleged violations of laws and regulations, and his failure to properly do so and his failure to cause the Company to disclose pending litigation and investigations make

him especially culpable for the wrongful conduct described herein. Moreover, he was the maker of many of the false statements and omissions of material fact that are alleged herein as he signed the 2015 10-K. Also, as a member of the Compensation Committee, he was charged with evaluating the CEO's performance, and his failure to properly do so makes him especially culpable for the wrongful conduct described herein. Thus, for these reasons, too, Defendant Hawkins breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

194. Additional reasons that demand on Defendant Sainz is futile follow. As a member of the Compliance Committee, she was required to provide oversight and monitor consumer protection, ethics, quality, recalls, safety, health and safety, and review on a regular basis litigation matters filed against the Corporation related to alleged violations of laws and regulations, and her failure to properly do so and her failure to cause the Company to disclose pending litigation and investigations make her especially culpable for the wrongful conduct described herein. Moreover, she was the maker of many of the false statements and omissions of material fact that are alleged herein as she signed the 2014 10-K and the 2015 10-K. Thus, for these reasons, Defendant Sainz breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

195. Additional reasons that demand on Defendant Shimer is futile follow. As a member of the Compliance Committee, she was required to provide oversight and monitor consumer protection, ethics, quality, recalls, safety, health and safety, and review on a regular basis litigation matters filed against the Corporation related to alleged violations of laws and regulations, and her failure to properly do so and her failure to cause the Company to disclose pending litigation and investigations make her especially culpable for the wrongful conduct described herein. Moreover, she was the maker of many of the false statements and omissions of material fact that are alleged herein as she signed the 2014 10-K and the 2015 10-K. Also, as Chair of the Compensation Committee, she was charged with evaluating the CEO's performance, and her failure to properly do so makes her especially culpable for the wrongful conduct described herein. Thus, for these reasons, too, Defendant Shimer breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

196. The Directors, as members of the Board, were and are subject to the Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations. The Code of Conduct requires the Directors to also adhere to Halyard's standards of business conduct. The Directors did not comply with the requirements of the Code of Conduct. The Directors violated the Code of Conduct because they knowingly or recklessly engaged in and facilitated

the misconduct alleged herein and participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Directors violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

197. Furthermore, demand in this case is excused because the Directors, who are named as defendants in this action, control the Company and are beholden to each other. The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

198. Halyard has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Halyard any part of the damages Halyard suffered, and will continue to suffer, thereby. Thus, any demand on the Directors would be futile.

199. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was

based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

200. The acts complained of herein constitute violations of fiduciary duties owed by Halyard's officers and directors, and these acts are incapable of ratification.

201. The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Halyard. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Halyard, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance

coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

202. If there is no directors' and officers' liability insurance, then the Directors will not cause Halyard to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

203. Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least five of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of Section 14(A) of the Securities Exchange Act of 1934

204. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

205. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent

or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l].”

206. Rule 14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no proxy statement shall contain “any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading.” 17 C.F.R. §240.14a-9.

207. The 2015 Proxy failed to disclose that, under the direction and watch of the Directors: (i) the Company failed to maintain internal controls; (ii) the Company’s MICROCOOL surgical gowns consistently failed effectiveness tests and failed to meet industry standards; (iii) complaints were frequently received and major litigation proceedings and federal investigations were commenced concerning the quality, marketing and sale of the Company’s MICROCOOL surgical gowns; and (iv) Kimberly-Clark and Halyard had knowingly marketed, sold, and distributed defective MICROCOOL surgical gowns, including to U.S. workers during the Ebola crisis.

208. The 2016 Proxy failed to disclose that, under the direction and watch of the Directors: (i) the Company failed to maintain internal controls; (ii) the Company’s MICROCOOL surgical gowns consistently failed effectiveness tests and failed to meet industry standards; and (iii) Kimberly-Clark and Halyard had knowingly

marketed, sold, and distributed defective MICROCOOL surgical gowns, including to U.S. workers during the Ebola crisis.

209. The Individual Defendants also caused the 2015 Proxy and the 2016 Proxy to be false and misleading in that they stated that the Individual Defendants upheld "sound governance practices" and were in compliance with "all applicable corporate governance requirements of the NYSE, the SEC, the SOX, and the provisions of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010." Indeed, due to the Individual Defendants' conduct with respect to the deceptive sale, marketing, and distribution of the defective MICROCOOL surgical gowns, the Individual Defendants failed to practice and/or uphold sound corporate governance practices.

210. In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2015 Proxy and 2016 Proxy were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2015 Proxy and the 2016 Proxy, including but not limited to, election of directors, approval of officer compensation, and appointment of an independent auditor.

211. The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2015 Proxy and the 2016 Proxy.

## SECOND CLAIM

**Against the Individual Defendants for Breach of Fiduciary Duties**

212. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

213. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Halyard's business and affairs.

214. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision. The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Halyard.

215. In breach of their fiduciary duties owed to Halyard, the Individual Defendants willfully or recklessly caused the Company to violate federal and state regulations by causing the Company to conceal material information concerning the quality of the High Performance Gowns from the consumers, the general public, and the government, and to fail to take any actions to halt the marketing, sale, and distribution of the defective products, and thus put unknowing physicians, health care

professional, and patients at danger of exposure to serious bacteria, viruses, and illnesses.

216. In breach of their fiduciary duties owed to Halyard, the Individual Defendants willfully or recklessly caused the Company to violate federal regulations by falsely stating and/or failing to disclose that under the Individual Defendants' direction and on their watch: (i) the Company's MICROCOOL surgical gowns consistently failed effectiveness tests and failed to meet industry standards; (ii) complaints were frequently received and major litigation proceedings and federal investigations were commenced concerning the quality, marketing and sale of the Company's MICROCOOL surgical gowns; and (iii) Kimberly-Clark and Halyard had knowingly marketed, sold, and distributed defective MICROCOOL surgical gowns, including to U.S. workers during the Ebola crisis.

217. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct those public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Halyard's securities.

218. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them.

219. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

220. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Halyard has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

221. Plaintiff on behalf of Halyard has no adequate remedy at law.

## <u>THIRD CLAIM</u>

### Against Individual Defendants for Unjust Enrichment

222. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

223. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Halyard.

224. The Individual Defendants either benefitted financially from the improper conduct and received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Halyard that was tied to the performance or artificially inflated valuation of Halyard, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

225. Plaintiff, as a shareholder and a representative of Halyard, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits -- including from benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

226. Plaintiff on behalf of Halyard has no adequate remedy at law.

**<u>FOURTH CLAIM</u>**

**Against Individual Defendants for Abuse of Control**

227. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

228. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Halyard, for which they are legally responsible. As a direct and proximate result of the Individual Defendants' abuse of control, Halyard has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Halyard has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

229. Plaintiff on behalf of Halyard has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Gross Mismanagement

230. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

231. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Halyard in a manner consistent with the operations of a publicly-held corporation.

232. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Halyard has sustained and will continue to sustain significant damages.

233. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

234. Plaintiff, on behalf of Halyard, has no adequate remedy at law.

## <u>SIXTH CLAIM</u>

### Against Individual Defendants for Waste of Corporate Assets

235. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

236. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Halyard to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, and to lose assets due to loss of investors and customers who no longer trust the Company.

237. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

238. Plaintiff on behalf of Halyard has no adequate remedy at law.

## **REQUEST FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Halyard, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Halyard;

(c) Determining and awarding to Halyard the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing Halyard and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Halyard and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Halyard to nominate at least four candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e) Awarding Halyard restitution from Individual Defendants, and each of them;

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: November 23, 2016

Respectfully submitted,


**THE ROSEN LAW FIRM, P.A.**

By: /s/ Laurence M. Rosen
Laurence M. Rosen, Esq. (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

**THE BROWN LAW FIRM, P.C.**
Timothy W. Brown

240 Townsend Square
Oyster Bay, NY 11771
Telephone: 516-922-5427
Facsimile: 516-344-6204Email:
tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

<u>VERIFICATION</u>

.

I, Kai Chiu, am the plaintiff in the within action. I have read the foregoing complaint and know the contents thereof. The allegations of the complaint are true of my personal knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 14 day of November, 2016.

Kai Chiu